Mr. Dunner. Good morning, Your Honor. As you may have pleased the Court, there are many issues in this case. I don't have time to deal with all of them, so I'd like to deal with just a few and leave the rest for my brief. I would really suggest that the fact that I'm not dealing with certain issues doesn't mean I feel they're less important than others. I'd like to start with the Burr article, and I'd like to start with the definitive recognition issue, and the best place for me to start is with Xerox 2, the second Xerox opinion, in which Judge Bryson, writing for the Court, made the following statement, and I'm quoting just part of it. As long as the system completes the recognition of the unistroke symbol, subsequent action by the user or subsequent processing by the computer to delete or replace that symbol does not negate that recognition. Palm focuses on the second half of that statement and says that Xerox 2 has decided the definitive recognition issue for Burr. I submit that the first half of that statement makes it clear that that is not the case, because the first half of the statement says, as long as the system completes the recognition of the unistroke symbol, and it is our position that in Burr that does not happen until after the dictionary lookup. Let me be specific. Burr has a system, he has two algorithms. He has a shape matrix algorithm, and then he has a dictionary lookup algorithm. The computer generates a dissimilarity curve for each of the letters, 26 dissimilarity curves. The computer does not make a decision at that point as to which one of those dissimilarity curves is the right one. Then, depending on the number of letters in the word, if there are 24 letters in the word, you have 4 times 26, or 104 different dissimilarity numbers, and the computer then generates a shape matrix. Even at that point, the computer does not pick a word, does not pick a letter. It is only after the dictionary lookup that happens after that point that the computer makes a choice. All you have are dissimilarity numbers, possibilities, probabilities. The computer does not make a choice. We submit that that is not definitive recognition, and we further submit that POM's reliance on snippets, on words from Burr that talk of single letter and whole word recognition, or individual character errors, or what have you, our expert witnesses have made it clear, their belief, that that is a hindsight analysis, that after the shape matrix you can go back and look at those letters. To say that that indicates that there is definitive recognition before that point is inconsistent with the basic operation of Burr. Now there's a second reason that Burr is not an anticipatory reference, and that is that the definitive recognition requirement has a precondition in it. The precondition is that there must be sufficient graphical separation to permit the computer to definitively recognize the symbol on penup. POM argues that Xerox 2 wiped out that precondition, wiped out the condition that there must be definitive recognition, did Xerox 2 not do that, but the concurring opinion of Judge Clevenger in Xerox 1, where he said he agreed with the court that accuracy is required, definitive recognition and accuracy are required, that is key to the graphical separation, preamble of the definition of unistrokes. Now POM also argues that we, actually we being in Xerox, took a contrary position in Xerox 2. We did not take a contrary position. Our position in Xerox 2 was that there is a precondition for definitive recognition of sufficient graphical separation. In Xerox 1, this court found that there was definitive recognition. In order to find that there was definitive recognition, it had to first find that there was sufficient graphical separation. It had to do that. Not only did it have to do that, but it did that. It expressly said that had the district court followed its own claim construction, it would have found that graffiti, the Xerox, the POM symbols, were in fact graphically separated. So all we were saying was that if in fact, under those circumstances, if you found definitive recognition, you necessarily must have found graphic separation, only because it's a precondition of finding definitive recognition. And what POM does is they cite every page in the book, except page 2293 of the record, where we make it clear that we did not deprive graphical separation of independent meaning. And rather, it confirmed that the degree of graphical separation need only be sufficient for the computer to definitively recognize a symbol immediately on pen list. Of course, I suppose that the distinction or the extent to which there is sufficient graphical separation is really a function, at least in part, of the sophistication of the system that's doing the recognizing. In other words, you could have one rather crude detection system, which would be incapable of distinguishing among otherwise seemingly different characters, and another one which is very good at doing it, and would be able to make a determination between two letters that otherwise look pretty similar. Right? Your Honor, this invention presupposes that you not only have unistroke symbols, which are symbols designed geometrically and directionally so that you can tell the difference, but presupposes a system that is capable of taking advantage of the unistroke approach. So, I disagree. While in the abstract you could have a system that doesn't work, this invention presupposes that you're following the patent, and that you are using a system that will make it possible to have sufficient graphical separation to definitively recognize... Well, I guess what I'm saying really is, to pick up on an expression that you just used, if it works, isn't there by definition, or pathologically even, a sufficient graphical separation? No, Your Honor, because what... it depends what you mean by works. Well, if it can achieve definitive recognition, character by character. Your Honor, the invention, as Judge Coventer said in his concurrence of Xerox One, accuracy is part of the equation. Under Palm's approach, if you had a system that had zero accuracy, it was incapable of distinguishing between anything, because it was garbage. It was a garbage system. They say that as long as the system is saying, I'm through, on pen up, it doesn't make any difference whether it's accurate or not. It doesn't make any difference whether anything has been recognized or not. The only key to them is, has somebody said I'm through? It's over. And all I'm saying is, there's an element of graphical separation built in to the definitive recognition definition, and you must have accuracy. In fact, Judge Coventer said, every single stroke symbol must be a unistroke symbol, which means it must satisfy the definitive recognition requirement, the spatial independence requirement, and also the graphical separation requirement. So every symbol must, in your system, in the system of this invention, must do it. Now that doesn't mean that if a drunk comes up and says, I want to write a word, and writes something that's totally gibberish or illegible, that doesn't mean that the system is bad. The system contemplates that somebody is going to reasonably follow the guidelines that are set forth. One other question. What, in your view, is the distinction between graphical separation and being well separated in sloppiness space? Graphical separation, in general, is designed to, in a normal situation, where somebody reasonably tries to follow the guidelines, the prototypes, unistroke prototypes, and is capable of achieving success by doing that. The well separated in sloppiness space approach deals with, there's a definition right in the patent, it says little or no overlap. It permits somebody, not to be totally drunk and writing gibberish, but it permits somebody to write somewhat more sloppily. And it basically says, if there's little or no overlap, that is the test, then the symbols are designed to cope even with sloppy handwriting. But isn't that another way of saying they're graphically separated? No, what it is saying, they're both graphically separated, but one is super graphically separated. And the examples, there are 40 symbols in the patent, and those are super graphically separated. I mean, if I were a potential target of this patent, I would be concerned if I had a system that would have some graphical separation. I would have trouble knowing whether I had crossed the line of super graphical separation that you've just identified as being the trigger for sloppiness space. Your Honor, you shouldn't, and let me explain why you shouldn't. Let me ask the question this way. Suppose I had a system that both of us would agree was graphically, had graphically separate characters for purposes of this patent. Would that system, describe a system that would have that characteristic but not have sufficient separation and sloppiness space to avoid infringement? Okay. A system like that would contemplate, Palm keeps using the word perfectly written. It doesn't, it's not a question of whether the user perfectly writes. It's a question of whether or not you follow the guidelines, you come very reasonably close to the prototypes. So if you have a prototype that has an inverted V and a direction from left to right, and then you try to follow that reasonably well, in that case you are graphically separate. But if you write a little sloppily and it doesn't quite look like an inverted V, it doesn't look like a Q either, but it doesn't quite look like an inverted V because you've written it sloppily, you need a more refined system. You need a special set of graphical symbols in order to accommodate that sloppy writing. And this patent does that. In fact, all of the examples are, by example, suggested for well-separated sloppiness space. And the Goldberg article, which is an appendix, which is incorporated by reference in the patent, actually gives you some tests. It tells you, you can have a formal test or a short test. It tells you that written in sloppiness space symbols will be more accurate than the accuracy of reading normal Roman letters. So it gives you some tests and it tells you how to find out whether it's sloppy or not. I don't think you'd have any trouble doing that. If I could trouble you with one more question. There's a question as to whether Burr has a disclosure of directionality, stroke direction. Now there is a reference to the vector, the 2D vector with orientation in the direction of time flows. It sounds like it is at least with particular attention to the bottom of A1107. If you have it there, you're probably quite familiar with it. There's a reference to the formula there, which involves B sine theta and C sine phi. And it says the first two terms are the directional and positional similarity measures respectively. Does that suggest to you that Burr is in fact distinguishing based on stroke direction? No. And the reason it doesn't is that Burr is focused totally on shape matching, on shape matrix, shape patterns. All through this article he's talking about shape. As we point out in our brief, during the prosecution of the patent in suit, during the re-examination, it may have been the original re-examination, there was a Tsuyama reference. And the Tsuyama reference actually streamed coordinate pairs in stroke direction order from the digitizer. The same kind of thing that is being done in Burr and a similar kind of thing is being done in Nagayama. And we pointed out that Tsuyama did not rely on stroke direction. He relied on something else. The examiner accepted that, withdrew the rejection. All I'm saying is the fact that you have coordinates and enter them in a time-ordered fashion, just like in Tsuyama, does not answer the question. And that reference to directional in the bottom line of A1107, I think, is merely saying that. He doesn't use, the rest of the article doesn't focus on direction. It focuses on shape. So that's my answer to your question. Let's hear from the other side, Mr. Dunner, and we'll save your rebuttal time. Fine, Your Honor. Mr. Lee. May it please the Court, together with my partner, Richard O'Neill, I represent the defendants at the leaves. Before I move to the host of issues that Mr. Dunner has properly identified, let me answer Judge Bryson's question on stroke direction. Respectfully, we disagree, and I think I can tell you why. If you look at the portion, 111107, which Your Honor is identifying, it's describing what is going on in Figure 1. And there are two significant things here, Your Honor. First is, in Figure 1, it's not just comparing shapes. It's going sequence by sequence, vector by vector. And each of the vectors in sequential order has an xy coordinate dimension and a time factor, which is the order in which they've been written. And to confirm that, Your Honor, if you look at Figure 2, the question of stroke direction is actually quite explicit, I would suggest. In Figure 2, they're giving you examples of how the components are compared. The very last sentence deals with the situation, Your Honor, where the two vectors are anti-parallel. And anti-parallel, by any dictionary definition, is two strokes that are parallel, which is written from the opposite direction. So if you take the collection of what is it, the last column of 11107, which refers to taking the vectors based upon their relative positions and their orientation in time sequence, and then you read it amplified by Figure 2, and the explicit reference to anti-parallel, which takes account of stroke correction as a district court fact. But isn't this stroke direction that you're referring to is simply the recognition of certain letters that may be written in a conventional manner that changes directions occasionally? It's still shape recognition. It has nothing to do with the entire recognition process turning on which direction you turn the L or the inverted L. Your Honor, it's not limited to a specific set of, it discloses a specific set of letters. We're recognizing letters here in words, actually, more than letters. It goes word by word, doesn't it? It goes, it has a combination of recognizing letters and recognizing words. It's not symbols. So right off the bat, we've got a major distinction, don't we? I don't think so, Your Honor, if I could say why. Symbols, one version of symbols can be letters. Sure. I mean, everything's symbols. We're talking in symbols. Language is symbolic. But we're not at that level of abstraction. We're dealing with what Verr's dealing with, and it's recognizing letters and words according to their shape, not symbols according to their direction. Isn't that a distinction that even the Patent Office recognized in its re-exam? Well, Your Honor, let me take, I think there are three questions in that question. Let me take them in reverse order. First, the Patent Office. The chronology is important here. The re-examination was completed in 1999. Xerox I, which was decided, and Judge Newman was on the panel in 2001. Xerox II was decided in 2003, and the confirmation of the district court's characterization of Xerox I, which is there can be no useful set of spatially independent single-stroke symbols that does not infringe, which Xerox II described as very broad, was done in 2003. So, Your Honor, I think this is no different than many cases where the actions of the Patent Office have come before this court. Sure. Did they look at the same words? Yes. Okay. Now, that's the first question. Sure. The second question is, I think the fact that letters are symbols is more than just, it's directly relevant to Verr. In fact, Your Honor, one of the points that Xerox makes repeatedly is that the Goldberg article is incorporated by reference into the Goldberg patent. And one of the things you'll see, Your Honor, is he says you could use conventional letters for my single-stroke symbols. So, the fact that Verr happens to use single-stroke letters doesn't keep them from being symbols. But I guess the key comes down to Verr at no point discloses identical symbols which differ only in the direction of the stroke. You actually are writing an A, which happens to change direction when you put the downstroke on what would otherwise be an O. But that's very different from symbols, arbitrary symbols, which differ only in the stroke direction. Your Honor, there are two answers. Is there any instance of that in Verr, where there is an arbitrary symbol, a Z type of thing, which is only distinguished from a different symbol by the direction of the stroke? Well, Your Honor, two answers to that question. First, if you take the O and the A and you apply the same standards that this Court applied in Xerox I, the O and the A are very close to identical. No, they're different symbols, very clearly. We understand that on and at are different letters. You have an A with a tail and an O that's perfectly circular. If that were true, Your Honor, then the O and the Q— And I can make the O going left, or I can make it going right, and it's recognized the same way. Well, Your Honor, if that's true, then we would have to revisit the O and the Q of the infringement determination of this Court. Because the O and the Q were virtually identical, except that they finished with a slightly different line. There was a different line, though. That's the point. They're not identical symbols distinguished only by stroke direction. Can you show me one in Verr which is identical except for stroke direction? The answer to your question is I cannot show you one of his 23 symbols that is identical just for stroke direction. But the question becomes, what does this disclose to one of ordinary skill in the art? And if I would draw Your Honor's attention to page 1108 and to figure 2, the question is if you have a disclosure to one of ordinary skill in the art, and you specifically disclose that you are analyzing symbols, and there's no limitation on the specific symbols that are used, and you are analyzing them on the basis of these 2D vectors in terms of orientation and sequence. And then, Your Honor, if you look at figure 2, and it specifically says that we will analyze anti-parallel vectors by adding… But Mr. Lee, this is anticipation. I understand, Your Honor. It's got to be each and every, down to the, excuse me, letter. Your Honor, it has to be what the reference discloses to one of ordinary skill in the art. Just a second. When you start bringing the ordinary skill in the art in here, that's what starts to worry me. I think you're making an obvious argument. I'm not, Your Honor. I think… You're saying that one would interpret these as identical signals differed only by direction of stroke. Yes. And what I'm saying… They would say an A is identical to an O. No. They would say two things. The people of skill in the art are smarter than that. Well, I'm not one of skill in the art. So, in part, I'm offering that as the prism through which fur must be analyzed. But there are two answers to Your Honor's question. One is the disclosure of anti-parallel vectors, which definitely are parallel. They look the same. The only difference between them is they are made in the opposite direction. The second, Your Honor, is if you then look, you combine that disclosure with the preceding page, which is 1107, and you look at what is happening. And let me… I didn't answer probably the very first part of Your Honor's question, which is… It's my fault. No, no, no. We're talking about character recognition. And, in fact, fur is explicit. It refers to single character recognition. It says so in the discussion, in the second paragraph of the discussion. It says so in the very first line of the conclusion. And if I could draw Your Honor's attention to page… Let me look at the page precisely. Page 1111, you will see… Let me correct myself. The last sentence of the discussion deals explicitly with the time required to recognize one character. And the very first line of the conclusion is this. A method has been demonstrated for computer recognition of isolated script characters. Now, the question then becomes… I think that was the part I didn't answer of Your Honor's question, whether we're talking words or characters. And respectfully, I don't think that we've taken words from isolation. The substance of fur is, as we argued to the court in Xerox 2, a two-part analysis, symbols and words. That then gets to how are these single character symbols identified. And I think my statement about one abhorring a skill in the art, Your Honor, is only that the prism through which fur is to be viewed is not me as lawyer or advocate, but someone who's skilled in the field. And I think that for anticipation, that applies as well. And if you look at the portion at 1107 under dynamic programming, it deals with the manner in which the 2D vectors are analyzed. And then you realize that what the next page says is, and as I understand it, what it says, and if there is nothing other than the anti-parallel nature of the vectors, we're going to add a gamma to the equation so that we can recognize that vector. And that is what's disclosed in birth. So I think, Your Honor, setting aside what happened with the PTO, I think that fur fairly red refers to single character recognition as well as ultimately recognizing words. It actually refers to it quite accurately. One of the things that Xerox has argued, Your Honor, is that fur, and I'm going to quote, has poor accuracy. The fact of the matter is, Your Honor, there's only one thing or two things in the record on the accuracy of fur. First, at page A1142, you will find the Tappert article that correctly says that fur discloses at least a 90% accuracy level. And even from the perspective of someone not skilled in the art, if you look at Figure 5, where there are two sets of handwriting, and there are two different people who are writing in Figure 5, and this is at page 1110, and this was briefed to the court in Xerox, too. On the left-hand side, there's an A and a B at page 1110. On the left-hand side, you will find that the accuracy level was 83%. On the right-hand side, you'll find that the accuracy level was about 95%, just counting letters. And then the one thing that's in the record before Your Honors is at page A1142, where Dr. Tappert, in a review article, says fur discloses character recognition at 90%. And the subsequent word recognition algorithm allows him to get to 100%. How does that help you? How does that help you in saying it infringes only if it works? No. Well, Your Honor, there are two things. Or it anticipates only if it works. I think there are two separate answers, Your Honor. First is if we were to take the articulation of there is no, that any useful set of spatially independent single-stroke symbols infringes, these are then. I was addressing in part the suggestion that there needs to be a specific level of accuracy. It's not in the claims, but because I was on Burr, I wanted to address the fact that, in fact, there is evidence in the record of that fact which is undisputed. The question Your Honor asked, I think, was a little bit to Judge Bryson's question about spatial independence, a graphic separation, and whether if you have a usable set of single-stroke symbols, they are, in fact, graphically separated. I think the import of Xerox 1 and 2 is the answer, is that you do. And if I could finish the answer to the question, Your Honor, I'm about to run out of my time. The progression is this. In Xerox 1, we, POM, made the argument to you that graphically separated required recognition even when imperfectly formed. And the court came back and said, no, there are other claims that require a distinction in sloppiness space. They, therefore, must mean that the graphic separation is if the symbols are formed as instructed, and that argument came explicitly from the Xerox argument, then they're graphically recognized. So I think the answer to Your Honor's question, in part to Judge Bryson's question that you asked Mr. Dunner is, as we sit here today, if the symbol is written as instructed, to quote expressly Xeroxed, and it is recognized by the computer, it is graphically separated. Now, that still leaves the question of how you distinguish between graphic separation and well separation in sloppiness space. And I think the answer is you can't. The idea of a super graphic separation, for as long as this case has been pending, I think the first time anybody's heard about that is today. And if you have a situation where you cannot, you don't know what the degree of overlap is, much less how you determine what that degree is, then it should be determined to be indefinite, as it just reports now. Any questions for Mr. Lean? Thank you, Mr. Lean. Thank you. Mr. Dunner. I will be brief, Your Honor. Mr. Lean talked about his expert witness Tappert and the article where he talked about 90% accuracy for Burr. If Your Honors will look at A1769 and 1142, you will see that Mr. Tappert said that a workable system has 95% accuracy. But the fact is that we're only talking about what the user does. The system itself has to be capable of 100% accuracy. As Judge Clevenger properly pointed out, every single-stroke symbol must be a unistroke symbol. I will make merely one last point, and that is this big debate about stroke direction certainly suggests that, at least as to that issue, there's a disputed issue of genuine material fact that should not be decided on summary judgment. In fact, the bottom line is, while we think summary judgment should be awarded to Xerox for a number of different reasons mentioned in the brief, at the very least, it should not be awarded to Palm because the points they raise, at the very least, raise disputed issues of material fact on certain of those issues. Unless there are other questions. Could I ask just one question, just so that I have your position with respect to the aspect of Burr that Mr. Lee focused on, and specifically the reference in Figure 2's discussion of anti-parallel B vector, anti-parallel to A vector, that the term gamma is added to the equation that appears on 1107. What's your understanding of the significance of those two statements? Your Honor, this is a very complicated article, but I'll do my best to answer it. My view is similar to parallels, the questions that Judge Rader was asking, that Burr is using these various techniques to end up with a shape. He ends up with a shape. And in the last analysis, he uses the shape. He may use anti-parallel lines as Mr. Lee pointed out, but the bottom line when he finishes is, he ends with a shape. And to decide what the bottom line is, which letters and word he should pick, he goes to the dictionary with the shape matrix and he looks for the lowest dissimilarity number, which is a shape-oriented number. It is not a directional-oriented number. The system of Goldberg, the patent we're talking about now, is an elegant and simple system in the sense that you can take a single line, like a one, and if you go from bottom to top, you will end up with one letter. And if you go from top to bottom, you will end up with a different letter. And Burr isn't doing that at all. Burr is part of prior art that everybody was improving on. Burr used cursive letters. He doesn't have any prototypes. He doesn't give you any guidelines or anything. That is my answer to your question. Okay. Thank you. Thank you, Mr. Jenner. Mr. Lee, please take a new position.